**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| SDP ENTERPRISES, LLC and<br>CHRISTOPHER ANDREW<br>YARBOROUGH,<br>     **Plaintiffs,**<br><br>**v.**<br><br>ARDN DEVELOPMENT, LLC and<br>JUDY ARD BELK,<br>     **Defendants.** | )<br>)<br>)<br>)<br>)<br>)     **CIVIL ACTION NO. 25-00375-KD-MU**<br>)<br>)<br>)<br>) |

## ORDER

This action is before the Court on the Motion to Compel Arbitration, (Doc. 4), filed by Defendants and the Motion for Specific Performance, (Doc. 7), filed by Plaintiffs. This case involves a dispute between business associates, and these motions involve a disagreement about which arbitration agreement governs that dispute. Upon consideration, and for the reasons below, Defendants' Motion to Compel Arbitration under the QSL II Agreement, (Doc. 4), is **DENIED**. Plaintiffs' Motion for Specific Performance, (Doc. 7), is **GRANTED in PART**, to the extent that Plaintiffs seek an order compelling arbitration under the QSL Agreement.[1]

### I.    BACKGROUND

Plaintiff Christopher Andrew Yarborough ("Yarborough") is the sole owner of SDP Enterprises, LLC ("SDP") (collectively, "Plaintiffs"). Defendant Judy Ard Belk ("Belk") is the sole owner of Ardn Development, LLC ("Ardn") (collectively, "Defendants). Yarborough and

---

[1] Plaintiffs alternatively moved for preliminary injunctive relief to an alleged violation of section 5.2(a) of the QSL Operating Agreement. At the hearing on these motions, counsel for Plaintiffs indicated that they are withdrawing this request. Accordingly, the motion for preliminary injunction is **MOOT**.

Belk have an extensive history of involvement with business entities through their own LLCs. The following outlines the relevant histories of the entities involved and the present dispute.

### 1. QSL and the QSL Operating Agreement

QSL, LLC ("QSL") was formed in 2006 as a real estate development company. Belk has been the Manager of QSL since its inception. Initially, QSL had four members: ARDN, SDP, Story Enterprises, LLC owned by Dr. Joseph Story, and Barclay Senior Living Services, LLC owned by Glenn Barclay. (Doc. 1-1 at 7). Each member owned a 25% equity interest in QSL. In 2012, Story's membership interest was redeemed and assumed equally by the three remaining members. In 2022, Barclay died. Since his death, SDP and Ardn have been the only two members of QSL. (Doc. 1-1 at 166; Doc. 2 at 2). Now, Yarbrough/SDP and Belk/Ardn each hold a 50% membership interest in QSL and each own 50% of QSL's voting interests. (Doc. 1-1 at 166; Doc. 2 at 2). Still, Jackie Barclay (who inherited Glenn Barclay's interest) holds a 33.33% economic interest in QSL. (Doc. 4 at 2; Doc. 4-2 at 2; Doc. 12 at 4).

The QSL Operating Agreement ("QSL Agreement") is signed by Yarborough and Belk. (Doc. 1-1 at 25). Section 1.6 of the QSL Agreement provides that QSL's ordinary business and affairs shall be managed by one or more managers. (Doc. 1-1 at 9). "The initial Manager shall be" Belk, and the Manager shall serve until a "successor is elected by the affirmative vote of Members owning a Majority of the Sharing Ratio Interests." (Id.). Section 5 of the QSL Agreement addresses the rights of—and restrictions on—the manager. (Id. at 16–17).

Section 13 of the QSL Agreement (titled "Voting Deadlock") contains an arbitration provision for resolving a deadlock in the voting between the members:

> In the event of a deadlock in the voting between the members, the members agree that they shall each designate in writing the name of a person other than themselves who is not related to them by blood or marriage. These designated persons shall designate in writing the name of a third person whom they agree is impartial and

trustworthy. Such selected third person shall serve as an arbitrator and shall decide in writing the issue regarding which there is a deadlock between the members. The members agree to be bound by the written decision of such selected person and agree that such decision shall be enforceable as a judgement in any court of competent jurisdiction.

(Doc. 1-1 at 24). The QSL Agreement does not define a "deadlock in the voting" and does not require member meetings. (Doc. 1-1 at 15). However, Section 4.2 provides that special meetings for any purpose "shall be held when called for by Members owning fifty percent (50%) or more of the Sharing Ratio Interests in the Company." (Doc. 1-1 at 15). According to the QSL Agreement, Barclay Senior Living Services LLC, SDP, and Ardn each own 33.33% of the Sharing Ratio Interests in QSL. (Id.).

### 2. QSL II and the QSL II Operating Agreement

In or about 2020, QSL (with certain other members) decided to create a new entity called QSL II, LLC ("QSL II") for future developments. (Doc. 4 at 2). Since 2020, QSL II has developed two properties. (Doc. 4 at 2; Doc. 4-2 at 2). QSL II still owns a percentage of the LLCs that own both properties. (Doc. 4 at 2; Doc. 4-2 at 2). Yarborough was a Co-Manager of QSL II until July 2025. (Doc. 4-2 at 2).

In 2020, the QSL II Operating Agreement ("QSL II Agreement") was signed by Belk (as the managing partner of QSL) and others. (Doc. 4-2 at 20–25). Yarborough's signature is not found in the QSL II Agreement. However, an email chain shows that before Belk signed the QSL II Agreement on behalf of QSL, Belk asked: "I assume I need to sign and that everyone has reviewed and in agreement?" (Doc. 12-1 at 122). Yarborough responded: "Yes." (Id.).

Section 10.1 of the QSL II Agreement contains an arbitration provision that applies to "all demands, claims, actions, and disputes . . . that may be based upon, arise out of, or relate in any way to [the QSL II] Agreement and/or the relationship of the Company, the Members, and/or the

Manager (and any Person acting at the Manager's direction)." (Doc. 4-2 at 13–14). Section 10.1(iii) provides that "arbitration shall proceed in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the 'AAA Rules')." (Id.).

### 3. QSLM

Yarborough and Belk were also involved with a separate entity called QSL Management, LLC ("QSLM"). (Doc. 1-1 at 166; Doc. 2 at 2). QSLM was formed in 2020 to serve as the management company and operator of senior living facilities in Florida and other states. (Id.). For some time, Belk held an interest in QSLM, but her interest was redeemed by other members in March 2025. (Doc. 7 at 5; Doc. 12 at 8).

### 4. Issues between Yarborough and Belk

Yarborough and Belk each outline a number of issues in their business association. Belk alleges that Yarbrough suffered a "breakdown" in 2023, which led to his exit from QSL for months and the execution of a limited power of attorney to Russ Myles, Jeanne Anderson, and Lee Rice. (Doc. 12 at 7; Doc. 12-1 at 3, 85). Belk further alleges that Yarbrough tried to "steal control" of QSLM because he "wanted to take" it for himself. (Doc. 12 at 8). These alleged actions led to "Belk begrudgingly agree[ing]" to make Yarborough CEO of QSLM in June 2024. (Id.). Belk also alleges that in January 2025, Yarbrough "attempted to waive on behalf of [QSLM] any conflicts that he had in setting up a competing interest." (Id.). Further, the alleged "unlawful and tortious actions" by Yarbrough resulted in Belk sending him a letter demanding that Yarbrough "preserve evidence related to his breaches of fiduciary duties." (Id.). Yarborough and Belk agreed that Yarbrough would buy out Belk's interest in QSLM in March 2025. (Id.; Doc. 7 at 7). But Belk alleges that the parties agreed to convene a mediation to resolve remaining issues and that Yarbrough has refused to participate. (Doc. 12 at 8).

4

Yarborough acknowledges that the redemption of Belk's QSLM interest "was an adversarial and protected process." (Doc. 1-1 at 166). However, Yarbrough alleges that "Belk continued to harbor animosity" for him and that he would soon learn that "Belk had no intention of even attempting to work cooperatively with him on QSL business matters." (Doc. 7 at 7). Yarbrough contends that Belk stopped communicating with him entirely around June/July 2025 despite repeated requests and, instead, referred him to speak with her attorney Benjamin Fultz ("Fultz"). (Id.). Yarbrough states that he pleaded with Belk and/or Fultz for several weeks to have productive discussions concerning QSL, but he was "ignored or met with absurd accusations intended to restrict and prevent [him] from performing duties Ms. Belk previously agreed he should handle." (Id. at 8).

**5. The Russ Myles Litigation**

In June 2025, Russ Myles ("Myles") filed a lawsuit against QSL, QSL II, and Belk. (Doc. 1-1 at 133); Russel Myles v. QSL, et al., in the Circuit Court of Mobile County, Alabama, Case No. CV-2025-901452 (Youngpeter, J.). The complaint provides that Myles (while a Senior Partner at the law firm McDowell Knight) began representing QSL and its affiliates in business matters. (Id.). Myles alleges that he and Yarbrough reached an agreement where Myles would join QSLM as its general counsel and be a part owner of the soon-to-be-formed QSL II under a "Put Agreement." (Id. at 134). Myles allegedly faced opposition from Belk when attempting to execute his Put Agreement, which led to Myles and Yarbrough attempting to seek a solution that would avoid litigation. (Id. at 140). After Belk allegedly "ignored the situation," Myles sued QSL for promoter liability and fraud, Belk for fraud, and QSL II for breach of contract. (Id. at 141–42).

On July 31, 2025, Belk, QSL II, and QSL, filed a motion to compel arbitration of the claims asserted in the Myles complaint under the QSL II Agreement. (Doc. 1-1 at 34). The complaint was

filed by Belk's attorneys in this action (Allen Graham and Benjamin Fultz). (Id. at 44–45). Yarbrough alleges that Belk did not disclose her plan to file the motion to compel and that he did not consent to its filing. (Doc. 11 at 5).

On August 29, 2025, Yarbrough and SDP moved to intervene in the Myles litigation. (Id.). Yarbrough and SDP also moved to stay or postpone any ruling on the motion to compel arbitration on grounds that the motion was void as to QSL because Belk's actions exceeded her express authority in the QSL Agreement. (Doc. 11 at 6). The state court is currently withholding ruling on the motions in the Myles litigation pending the outcome of the motions filed in this Court. (Doc. 11-3 at 2).

### 6. Yarborough's attempts to enforce Section 13 of the QSL Agreement

From approximately July 13 to August 1, 2025, Yarbrough emailed Belk and Fultz several times demanding to be added as co-manager of QSL and asking for Belk's vote on the matter. (Doc. 1-1 at 155–62). Yarbrough's emails requested that if Belk did not consent to Yarbrough as co-manager, then Belk/Fultz must designate who Belk nominates as a third-party neutral pursuant to Section 13's voting deadlock provision. (Id. at 155, 161). Neither Belk nor Fultz provided Belk's vote on the matter. However, Fultz responded to several of Yarbrough's emails expressing that he was willing to speak with Yarbrough on the phone or in person. (Doc. 1-1 at 156, 158). Yarbrough refused the requests and asked to have business discussions with Fultz in writing. (Doc. 1-1 at 154).

On August 5, 2025, Yarbrough emailed Fultz to reiterate his demand to be made co-manager or to follow the requirements of Section 13 and asked that he provide Belk's final position

by August 7, 2025. (Doc. 1-1 at 154). Neither Belk nor Fultz complied with Yarbrough's final request, and Yarborough engaged Anne McClurkin ("McClurkin") as counsel. (Doc. 7 at 12).[2]

### 7. The arbitration demand under the QSL II Agreement

On August 1, 2025, Yarbrough, Myles, and other members of QSL II sent Belk a "Demand for Arbitration" pursuant to the QSL II Agreement. (Doc. 4-1). The demand alleged that Belk "is attempting to unilaterally alter the governance structure of [QSL II] by removing Mr. Yarbrough as Co-Manager." (Id.). The demand acknowledged a "current dispute between Belk and Yarbrough" concerning whether "Belk possesses authority to act unilaterally on behalf of QSL and [w]hether Yarbrough, as a 50% equity owner of QSL, has the right to co-manage QSL." (Id.). In serving the arbitration demand on Belk, Yarbrough asked Belk for her choice of an arbitrator. (Doc. 4-3). On August 13, 2025, Belk sent Yarbrough and the others a list of arbitrators. (Doc. 4-4 at 3).

On August 23, 2025, McClurkin emailed Fultz explaining that she spoke with Yarbrough and the others and that "[a]ll parties are agreeable to postponing the arbitration demand pending resolution of the issue concerning Mr. Yarbrough's right to participate in the management of QSL." (Doc. 4-4 at 2). On August 29, 2025, an attorney at Fultz's firm responded and explained that they "had not received any feedback regarding the arbitrators [they] suggested." (Doc. 4-4 at 1). The same day, McClurkin responded by explaining that "the demand for arbitration is withdrawn, at this time and without prejudice, pending determination of the member deadlock." (Id.).

---

[2] The Court is aware that both Yarbrough and Belk argue that the other's representation is tainted by a conflict of interest. However, these allegations are not relevant to deciding the pending motions.

### 8.  The present action and pending motion

On August 27, 2025, Plaintiffs filed this action against Defendants in state court alleging breach of the QSL Agreement and fiduciary duties and sought declaratory judgment, specific performance, or injunctive relief. (Doc. 1-1 at 163–82). The next day, Plaintiffs filed their Motion for Specific Performance seeking an order compelling arbitration under the QSL Agreement, or in the alterative preliminary injunctive relief. (Doc. 1-1 at 191–205).

On September 4, 2025, Defendants removed the action and moved to compel arbitration under the *QSL II Agreement*. (Docs. 1, 4). Plaintiffs then filed a motion for specific performance seeking an order compelling arbitration under the *QSL Agreement*, or in the alternative preliminary injunctive relief. (Doc. 7).

### II.    LAW

Section 2 of the Federal Arbitration Act ("FAA") governs the "[v]alidity, irrevocability, and enforcement of agreements to arbitrate." 9 U.S.C. § 2. Agreements to arbitrate that involve interstate commerce are "valid, irrevocable, and enforceable*, save upon such grounds as exist at law or in equity for the revocation of any contract*." Id. (emphasis added). In other words, Section 2 requires courts enforce arbitration agreements unless the saving clause applies (i.e. grounds exist for revocation of the contract).

Section 4 governs orders compelling arbitration. "The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. Thus, "courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its

enforceability or applicability to the dispute is in issue." Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 299 (2010). "Where a party contests either or both matters, 'the court' must resolve the disagreement." Id.

When resolving the disagreement, courts must consider that the FAA reflects "both 'a liberal federal policy favoring arbitration,' . . . and the 'fundamental principle that arbitration is a matter of contract.'" AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (first quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983) then Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 67 (2010)). "[C]ourts must place arbitration agreements on equal footing with other contracts." Id. Thus, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995).

### 1. Two arbitrability issues: existence and scope

The first issue that courts may encounter is whether a valid agreement to arbitrate exists. This issue relates back to Section 2, which governs the validity of arbitration agreements. In short, Section 2's "saving clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (quoting Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 687 (1996)). As a result, a challenge "related to the making of [an arbitration] agreement" can provide grounds for the revocation of that agreement. AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 355 (2011) (Thomas, J., concurring).

The second issue that courts may encounter is whether the dispute in question falls within the scope of the arbitration agreement. "The court is to make this determination by applying the

'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.'" <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 626 (1985) (quoting <u>Moses H. Cone Memorial Hospital</u>, 460 U.S. at 24). "[A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." <u>Id.</u> "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." <u>Moses H. Cone</u>, 460 U.S. at 24–25 (the <u>Moses</u> Presumption).

### 2. Delegation agreements

Generally, the court decides arbitrability issues to "determine whether the parties agreed to arbitrate" the dispute in question. <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 626 (1985). However, the parties may decide to have these gateway issues (i.e., arbitrability) decided by an arbitrator instead through a delegation clause. <u>Attix v. Carrington Mortg. Servs., LLC</u>, 35 F.4th 1284, 1295 (11th Cir. 2022). But a "delegation clause is merely a specialized type of arbitration agreement." <u>New Prime Inc. v. Oliveira</u>, 586 U.S. 105, 112 (2019). "As with any arbitration agreement, before enforcing a delegation agreement, the court should ensure that the agreement was formed, that it applies to the dispute at hand, and that no grounds render it invalid or unenforceable." <u>Attix</u>, 35 F.4th at 1295.

"When analyzing whether the parties to a contract have agreed to arbitrate threshold questions of arbitrability, we 'reverse' the FAA's standard 'presumption' favoring arbitration." <u>Attix</u>, 35 F.4th at 1295 (citing <u>JPay, Inc. v. Kobel</u>, 904 F.3d 923, 929 (11th Cir. 2018)) (citation modified). In other words, the <u>Moses</u> Presumption is reversed, and "[c]ourts should not assume that the parties agreed to arbitrate arbitrability" without clear and unmistakable evidence. <u>First Options of Chi., Inc. v. Kaplan</u>, 514 U.S. 938, 944 (1995).

### 3. Substantive versus procedural arbitrability

Absent a delegation clause, questions regarding the *existence* and *scope* of an arbitration agreement are presumably for the court to decide. BG Group, PLC v. Republic of Argentina, 572 U.S. 25, 34 (2014). The Alabama Supreme Court calls these matters "substantive arbitrability" issues. Brasfield & Gorrie, L.L.C. v. Soho Partners, L.L.C., 35 So. 3d 601, 604 (Ala. 2009).

"On the other hand, courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration." BG Group, PLC, 572 U.S. at 34. The Alabama Supreme Court calls these matters "procedural arbitrability" issues. Brasfield & Gorrie, L.L.C., 35 So. 3d at 604. Procedural arbitrability matters "include claims of 'waiver, delay, or a like defense to arbitrability.'" BG Group, PLC, 572 U.S. at 35 (quoting Moses H. Cone, 460 U.S. at 25). They also "include the satisfaction of 'prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate.'" Id. (quoting Howsam, 537 U.S. at 85).

### III. MOTION TO COMPEL ARBITRATION

Defendants' motion to compel arbitration is based on an arbitration provision in the QSL II Agreement. Defendants argue that they have proved (1) the existence of QSL II's arbitration agreement, (2) that the contract affects interstate commerce, (3) and that the parties delegated all threshold issues of arbitrability to the arbitrator. Defendants seek an order compelling Yarborough to arbitrate his claims asserted in this action and staying this action pending the conclusion of that arbitration.

Plaintiffs contest the motion to compel arbitration under QSL II's agreement for several reasons. *First*, Plaintiffs argue that the QSL II arbitration provision does not apply to the claims

or relief at issue. *Second*, even if the QSL II agreement was applicable, the exceptions to the general rule against enforcing arbitration agreements against non-signatories do not apply. *Third*, this Court, not the arbitrator decides issues of substantive arbitrability. On this point, Plaintiffs also argue that the operative contract for arbitration of this dispute is QSL's arbitration agreement, which does not delegate arbitrability issues to an arbitrator.

Before granting the motion to compel arbitration, the Court must determine that the parties made an agreement to arbitrate under the QSL II Agreement. 9 U.S.C. § 2. As a preliminary matter, the Court must determine *who* decides whether the QSL II arbitration agreement is enforceable against Plaintiffs as non-signatories.

### A. Who decides whether the QSL II arbitration agreement is enforceable against SDP and Yarbrough?

The QSL II Agreement delegates arbitrability issues to the arbitrator, but Plaintiffs argue that they cannot be bound to the arbitration agreement delegation clause as non-signatories. Ultimately, an agreement to arbitrate arbitrability "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 704 (2010). The FAA requires courts to consider two principles when delegation agreements are implicated.

### 1. Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so.

"Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." First Options of Chi., Inc. v. Kaplan, 514 U.S.

938, 944 (1995) (citation modified).[3] *Why?* "[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995). Interpreting "silence or ambiguity" on the arbitrability issue "as giving the arbitrators that power . . . might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." Id. at 945. Thus, the question of arbitrability is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (quoting AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986)).

### 2.  Courts must consider challenges to the delegation clause's validity.

If "a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4." Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 67 (2010). *Why?* An "agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 70 (2010). And "[t]he *validity* of a written agreement to arbitrate (whether it is legally binding, as opposed to whether it was in fact agreed to . . . ) is governed by § 2's provision that it shall be valid 'save upon such grounds as exist at law or in equity for the revocation of any contract.'" Id. at n.1

These two principles have been applied by the Eleventh Circuit. "As with any arbitration agreement, before enforcing a delegation agreement, the court should ensure that the agreement

---

[3] The Supreme Court has clarified that this "'clear and unmistakable' requirement . . . pertains to the parties' *manifestation of intent,* not the agreement's *validity.*" Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 70 n.1 (2010).

was formed, that it applies to the dispute at hand, and that no grounds render it invalid or unenforceable." Attix v. Carrington Mortg. Servs., LLC, 35 F.4th 1284, 1295 (11th Cir. 2022). Therefore, the Court has two considerations: (1) have the parties clearly and unmistakably agreed to delegate questions of arbitrability to an arbitrator and (2) have Plaintiffs specifically challenged the enforceability of the delegation agreement. See id.

**B.  The delegation clause does not prevent the Court from performing its duty.**

Defendants argue that pursuant to the delegation clause, the parties agreed that the American Arbitration Association ("AAA") Rules apply to any dispute. And Defendants point to Rule 7 of the AAA Rules, which contains two relevant provisions: (a) that the arbitrator has the "power to rule on . . . any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim" and (b) that "the arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part." (Doc. 4 at 13).

Because of these provisions, Defendants believe that any issues of arbitrability must go to the arbitrator—including whether the arbitration provision may be enforced against a non-signatory to the contract. In other words, Defendants argue that the Court cannot determine whether the parties agreed to arbitrate arbitrability under the QSL II Agreement.

In support, Defendants cite several Alabama Supreme Court cases involving arbitration agreements that incorporated the AAA rules and delegated all arbitrability issues to the arbitrator. Anderton v. Prac.-Monroeville, P.C., 164 So. 3d 1094 (Ala. 2014); Bugs "R" Us, LLC v. McCants, 223 So. 3d 913, 919 (Ala. 2016); Managed Health Care Admin., Inc. v. Blue Cross & Blue Shield of Alabama, 249 So. 3d 486, 492 (Ala. 2017); Wiggins v. Warren Averett, LLC, 307 So. 3d 519 (Ala. 2020); Managed Health Care Admin., Inc. v. Blue Cross & Blue Shield of Alabama, 249 So.

3d 486, 492 (Ala. 2017). These cases circulate a statement from <u>Anderton</u> that an arbitrator decides whether an arbitration provision may be used to compel arbitration between a signatory and a non-signatory when the AAA rules are incorporated. <u>Anderton</u>, 164 So. 3d at 1102. But the circulation of this statement does not prevent this Court from determining whether the non-signatory Plaintiffs agreed to arbitrate arbitrability. There are two reasons why.

*First*, preventing a court from determining whether a non-signatory agreed to arbitrate arbitrability strays from Supreme Court precedent regarding the FAA.[4] The FAA is a federal statute. It is the Supreme Court's "responsibility to say what a federal statute means, and once the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law." <u>James v. City of Boise, Idaho</u>, 577 U.S. 306, 307 (2016) (citation modified). The Supreme Court is clear: "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." <u>First Options of Chi., Inc. v. Kaplan</u>, 514 U.S. 938, 944 (1995).[5]

The Eleventh Circuit repeated this principle when a party to an arbitration agreement (Starbucks) argued that the agreement's "delegation clause grant[ed] exclusive jurisdiction to an arbitrator to determine whether" the nonparty to the arbitration agreement (Lubin) "must arbitrate." <u>Lubin v. Starbucks Corp.</u>, 122 F.4th 1314, 1319 (11th Cir. 2024):

> It is true that "parties may agree to commit even threshold determinations to an arbitrator, such as whether an arbitration agreement is enforceable." <u>Parnell v. CashCall, Inc.</u>, 804 F.3d 1142, 1146 (11th Cir. 2015). But courts "should not

---

[4] For a longer discussion on the issues with this idea, see <u>Wiggins v. Warren Averett, LLC</u>, 307 So. 3d 519, 525 (Ala. 2020) (Mendheim, J., dissenting).

[5] Necessarily then, the "court should decide whether an arbitration clause applied to a party who 'had not personally signed' the document containing it." <u>BG Grp., PLC v. Republic of Argentina</u>, 572 U.S. 25, 34 (2014) (quoting <u>First Options</u>, 514 U.S. at 941, 943–47). Again, a "court should decide whether the arbitration contract bound parties who did not sign the agreement." <u>Howsam v. Dean Witter Reynolds, Inc.</u>, 537 U.S. 79, 84 (2002) (summarizing the holding in <u>First Options</u>).

assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." . . . .

. . . .

. . . Lubin is not a party to the delegation clause. And absent an agreement between Lubin and Starbucks, "a court cannot compel the parties to settle their dispute in an arbitral forum." Bazemore, 827 F.3d at 1329 (quoting Klay, 389 F.3d at 1200). Arbitration agreements are no more enforceable than an average contract, and we "may not devise novel rules to favor arbitration over litigation." Morgan v. Sundance, Inc., 596 U.S. 411, 418 . . . (2022). The delegation clause, just like every other clause in the arbitration agreement, was between Starbucks and Lubin's wife, not Lubin. We thus conclude that the terms of the arbitration agreement do not require Lubin to arbitrate his claim against Starbucks, absent another principle of law or equity.

Lubin, 122 F.4th at 1319–21 (citations omitted). Ultimately, the Eleventh Circuit concluded that "[n]o such principle of law or equity" applied and affirmed "the district court's order denying Starbuck's motion to compel the arbitration of Lubin's claim." Id. at 1318, 1324. Thus, federal precedents make it abundantly clear that this Court must decide whether the non-signatory Plaintiffs agreed to arbitrate arbitrability.

*Second*, the Supreme Court made it clear that "traditional principles" of state law regarding contract formation govern whether non-signatories may be bound to an arbitration agreement. Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 631 (2009) (quoting 21 R. Lord, Williston on Contracts § 57:19, p. 183 (4th ed. 2001) ("'Traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.'"). However, the Alabama Supreme Court's statement from Anderton that a non-signatory must be compelled to arbitrate arbitrability whenever the AAA rules are incorporated is not a traditional principle of state law contract law that binds this Court pursuant to Carlisle. In fact, the logic behind this idea is fundamentally flawed.

As the Court understands it, the theory is that incorporation of the AAA rules is clear and unmistakable evidence of the "parties' intent to arbitrate the scope of the arbitration provision." Anderton v. Prac.-Monroeville, P.C., 164 So. 3d 1094, 1102 (Ala. 2014) (quoting CitiFinancial Corp. v. Peoples, 973 So. 2d 332, 340 (Ala. 2007)). It is logical that incorporation of the AAA rules in an arbitration agreement shows clear and unmistakable evidence that *the parties to that agreement* agreed to delegate arbitrability.[6] It is not logical to conclude that the incorporation of the AAA rules shows clear and unmistakable evidence that a *nonparty to that agreement* agreed to delegate arbitrability. No ordinary state-law principle governing the formation of contract (e.g., assumption, third-party beneficiary theories, estoppel) supports that conclusion.

### C. The issue is whether Plaintiffs and Defendants clearly and unmistakably agreed to the delegation clause.

Properly understood, the Court's duty at this stage is to determine whether the parties have clearly and unmistakably agreed to arbitrate arbitrability under the QSL II Agreement. Whether the parties agreed to arbitrate arbitrability under the QSL II Agreement turns on "ordinary state-law principles that govern the formation of contracts." First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995). The Moses presumption in favor of arbitration is reversed, and courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." Id.[7]

---

[6] That was the case in CitiFinancial Corp. and "the case upon which the CitiFinancial Corp. Court primarily relied in reaching its conclusion, Terminix International Co. v. Palmer Ranch Ltd. Partnership, 432 F.3d 1327 n.6 (11th Cir. 2005)." Wiggins v. Warren Averett, LLC, 307 So. 3d 519, 525 (Ala. 2020) (Mendheim, J., dissenting). In other words, "'the parties' referred to in CitiFinancial Corp. were *the parties to the contract* because the parties in the case and the parties to the contract that contained the arbitration provision were the same." Id. at 1327.

[7] "When analyzing whether the parties to a contract have agreed to arbitrate threshold questions of arbitrability, we 'reverse' the FAA's standard 'presumption' favoring arbitration." Attix, 35 F.4th at 1295 (citation modified) (citing JPay, Inc. v. Kobel, 904 F.3d 923, 929 (11th Cir. 2018)).

Both parties argue that Alabama's state-law principles governing contract formation apply. Because the parties rely upon Alabama law, we presume its applicability. See Bailey v. ERG Enters., LP, 705 F.3d 1311, 1320 (11th Cir. 2013). Under Alabama law, "[t]he basic elements of a contract are an offer and an acceptance, consideration, and mutual assent to the essential terms of the agreement." Armstrong Bus. Servs., Inc. v. AmSouth Bank, 817 So. 2d 665, 673 (Ala. 2001). "Assent to arbitrate is usually to be manifested through a party's signature on the contract containing the arbitration provision." Ex parte Stamey, 776 So. 2d 85, 88–89 (Ala. 2000).

Here, Plaintiffs did not sign the QSL II operating agreement, which contains the delegation clause. Thus, mutual assent to the delegation clause in the contract is not evident. "However, both Federal courts and Alabama courts have enforced exceptions to this rule." Id. Two relevant exceptions are the equitable estoppel exception and the third-party beneficiary exception. Id. Defendants argue that both exceptions apply.

### 1. Equitable estoppel exception

The theory of equitable estoppel is applicable when a non-signatory "asserts legal claims to enforce rights or obtain benefits *that depend on the existence of the contract that contains the arbitration agreement*." Custom Performance, Inc. v. Dawson, 57 So. 3d 90, 98 (Ala. 2010). But "to the extent that the nonsignatory's claims do not rely on the existence of the contract containing the arbitration provision, the nonsignatory is not estopped from avoiding arbitration." Id. Here, Plaintiffs assert claims in this case that do not depend on the QSL II operating agreement. The claims in this case relate solely to governance of QSL, a separate entity from QSL II. Specifically, Plaintiffs demand of arbitration on the QSL II agreement related to Yarbrough's removal as a manager of QSL II. The claims in this case relate to Yarborough's endeavor to be a co-manager of

---

Therefore, "ambiguities in an agreement to arbitrate questions about the arbitrability of those claims in favor of the party opposing arbitration." Attix, 35F.4th at 1296.

QSL. And while success in this case may yield positive results in the QSL II case, the demand in the QSL II case does not estop Plaintiffs from objecting to the application of the QSL II arbitration agreement to the QSL management issue.

Moreover, the intertwined-claims theory is not applicable. "[W]hen a non-signatory attempts to enforce an arbitration agreement against a signatory, courts have estopped the signatory from denying the existence of the arbitration provision when the non-signatory's claims are intertwined with the agreement that the estopped party has signed." Thomas v. Redman Manufactured Homes, Inc., 244 F. Supp. 2d 1295, 1296 (M.D. Ala. 2003). This situation—known as intertwined-claims theory—"is not applicable, however, when a signatory attempts to compel a nonsignatory third party to arbitrate claims it may have against a signatory." Edwards v. Costner, 979 So. 2d 757, 764 (Ala. 2007). Here, Defendants (signatories) are attempting to compel Plaintiffs (non-signatories) to arbitrate. Thus, the intertwined-claims theory does not apply.

### 2. Third-party beneficiary exception

The third-party beneficiary exception provides "that a contract made for the benefit of a third person may, at his election, be accepted and enforced by him." Michie v. Bradshaw, 149 So. 809, 814 (Ala. 1933). Conversely, if the third-party beneficiary "claims the benefits, he also assumes the burdens." Id. In other words, a third-party beneficiary can enforce a contract he did not sign, but "a third-party beneficiary cannot accept the benefit of a contract, while avoiding the burdens." Georgia Power Co. v. Partin, 727 So. 2d 2, 5 (Ala. 1998).

Only an intended beneficiary can be a third-party beneficiary. "It has long been the rule in Alabama that one who seeks recovery as a third-party beneficiary of a contract must establish that the contract was intended for his direct, as opposed to incidental, benefit." Locke v. Ozark City Bd. of Educ., 910 So. 2d 1247, 1250 (Ala. 2005) (citation modified). "[I]n order for a person to

be a third-party beneficiary of a contract, the contracting parties must have intended to bestow benefits on third parties." Id. at 1251.

The third-party beneficiary status allows the third-party beneficiary to accept and enforce the contract. Michie, 149 So. at 814. However, the third-party beneficiary is not bound to the contract unless he is attempting to enforce it. Id.; Partin, 727 So. 2d at 5; Cook's Pest Control, Inc. v. Boykin, 807 So. 2d 524, 527 (Ala. 2001); Scroggins v. Andalusia Reg'l Hosp., No. 2:16-CV-00338-ECM, 2021 WL 848994, at *5 (M.D. Ala. Mar. 5, 2021) (explaining that a third-party beneficiary must be intended and must elect to accept and enforce the contract to be bound by it).

Here, Defendants argue that the QSL II Agreement has a specific third-party provision that intends the arbitration clause to benefit "any agent, principal, officer, successor, or assignee of any parties to this Agreement." (Doc. 20 at 8) (quoting QSL II Operating Agreement, § 10.1(vi)). Defendants also point out that Yarborough filed a demand for arbitration under the QSL II Agreement and argues that it was on the same operative facts. Defendants argue that because of this, Plaintiffs consented to the QSL II arbitration agreement under a third-party beneficiary theory.

Based on the Alabama law regarding the third-party beneficiary exception, the Plaintiffs are not bound to arbitrate under the QSL II Agreement—nor can they be deemed to have consented to the delegation clause. The specific third-party provision in the QSL II Agreement may cover Yarborough and give him status as a third-party beneficiary, however, as explained previously, Yarbrough's claims in this case relate to the governance of QSL and in no way invoke any benefits delineated in the QSL II agreement. And to the extent that it can be argued that Yarbrough invoked benefits through his demand for arbitration as it related his removal as a manager of QSL II, the demand has been withdrawn.

20

In sum, Plaintiffs did not sign the QSL II arbitration agreement. As non-signatories, Plaintiffs "cannot be compelled to arbitrate absent another principle of law or equity." <u>Lubin v. Starbucks Corp.</u>, 122 F.4th 1314, 1324 (11th Cir. 2024). Neither equitable estoppel nor the third-party beneficiary exception applies. Accordingly, Defendants have not presented clear and unmistakable evidence that Plaintiffs agreed to arbitrate arbitrability under the QSL II delegation clause. And the Court cannot compel Plaintiffs to arbitrate arbitrability under an agreement they never formed.[8] Thus, Defendants' motion to compel arbitration, (Doc. 4), is **DENIED**.

## IV.    MOTION FOR SPECIFIC PERFORMANCE

Plaintiffs seek an order requiring Belk's specific performance under the voting deadlock provisions in Section 13 of the QSL operating agreement, which provides for arbitration when there is a voting deadlock. Effectively, Plaintiffs desire a motion to compel arbitration. As such, Plaintiffs argue that the requirements for compelling arbitration under the FAA are met.

Defendants respond with two main arguments. *First*, the Court should compel arbitration under the QSL II Agreement instead because Yarborough initiated that demand prior to the present complaint. *Second*, the claims are not ripe because there is no voting deadlock under Section 13 as there has been no vote, Yarbrough has not called for a special meeting, and Yarborough has not designated a neutral to resolve the alleged deadlock.

---

[8] Attempting to invoke the severability principle, Defendants argue that Plaintiffs "have not challenged the validity of the delegation provision." (Doc. 20 at 5). However, Plaintiffs' challenge to the existence of the QSL II Agreement is a challenge to the validity of the QSL II delegation clause. As a reminder, the severability principle is the idea "that a party seeking to avoid arbitration must directly challenge the arbitration or delegation clause, not just the contract as a whole." <u>Coinbase, Inc. v. Suski</u>, 602 U.S. 143, 150–51 (2024). "But this rule does not require that a party challenge *only* the arbitration or delegation provision. Rather, where a challenge applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge." <u>Id.</u> at 151. "[B]asic principles of contract and consent require that result." <u>Id.</u>

Plaintiffs' reply argues that a special meeting is not required and points out that no member has enough Sharing Ratio Interests to call a special meeting. Plaintiffs argue that Defendants' ripeness arguments (based on the failure to call a special meeting and designate a neutral) are unavailing because the arbitrator decides whether a condition precedent has been met. Plaintiffs also argue that they have established a voting deadlock and may enforce Section 13.

**A. Whether the requirements for compelling arbitration are met.**

The first issue is whether the requirements for compelling arbitration under the QSL Agreement are met. The QSL Agreement does not contain a delegation clause. Therefore, substantive arbitrability issues (existence and scope) are for the Court to decide. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985). Procedural issues, such as whether a "procedural condition precedent to arbitration" has been satisfied, are for the arbitrator to decide. BG Grp., PLC v. Republic of Argentina, 572 U.S. 25, 35 (2014).

**1. Substantive arbitrability issues (existence and scope)**

The Court must be satisfied that the QSL arbitration agreement exists. In other words, the Court must determine that the parties made an agreement to arbitrate under the QSL operating agreement and that no grounds for revocation of the contract exist. 9 U.S.C. § 2. Here, Defendants do not contest the existence of the QSL arbitration agreement between the parties. (Doc. 12 at 12). And the QSL contract contains the signatures of Yarborough and Belk. (Doc. 1-1 at 25). Thus, the Court is satisfied of the existence of the QSL arbitration agreement.

Having determined that the QSL arbitration agreement exists, the question is whether the dispute raised by Plaintiffs falls within the scope of the arbitration agreement. "The court is to make this determination by applying the 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.'" Mitsubishi Motors Corp. v. Soler Chrysler-

Plymouth, Inc., 473 U.S. 614, 626 (1985) (quoting Moses H. Cone Memorial Hospital, 460 U.S. at 24). "[A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." Id. The arbitration provision in Section 13 of the QSL Agreement provides:

> In the event of a deadlock in the voting between the members, the members agree that they shall each designate in writing the name of a person other than themselves who is not related to them by blood or marriage. These designated persons shall designate in writing the name of a third person whom they agree is impartial and trustworthy. Such selected third person shall serve as an arbitrator and shall decide in writing the issue regarding which there is a deadlock between the members. The members agree to be bound by the written decision of such selected person and agree that such decision shall be enforceable as a judgement in any court of competent jurisdiction.

(Doc. 1-1 at 24). Thus, a dispute involving a "deadlock in the voting" falls within its scope.

Plaintiffs' dispute arises from Yarborough's attempt to protect his membership interest in QSL by becoming a co-manager. Plaintiffs contend that Yarborough has repeatedly requested that he be recognized as a co-manager. Plaintiffs argue that Belk denied his requests, creating a deadlock between the only two members. Thus, Plaintiffs allege that a voting deadlock has resulted and that the arbitration provision in Section 13 of the QSL Agreement is the specific mechanism for resolving this dispute.

Defendants argue that "it is undisputed that there is no 'voting deadlock'" because "Yarborough has not met the condition precedent to invoke" Section 13. (Doc. 12 at 20). Defendants contend that there has been "no vote" on Yarborough's request to be co-manager and that Belk has not taken a position on it. (Id.). Moreover, Defendants argue that Yarborough "has the right to call for a Special Meeting" where he can put his request to a vote. (Id.).

The Court's role at this stage is not to determine whether conditions precedent to voting deadlock have occurred. Whether a "procedural condition precedent to arbitration" has been

satisfied is for the arbitrator to decide, not the Court. BG Grp., PLC v. Republic of Argentina, 572 U.S. 25, 35 (2014). The Court's role is to determine whether QSL's arbitration provision applies to the type of controversy before the Court. In other words, the Court must decide whether the parties' dispute involves a deadlock in the voting between the members. If it does, this issue is arbitrable.

The agreement does not define when a voting deadlock occurs. In general, a deadlock is defined as "[a] state of inaction or stoppage resulting from opposition, a lack of compromise or resolution, or a failure of election." Deadlock, Black's Law Dictionary (12th ed. 2024). Specific to corporations, a deadlock is "[t]he blocking of corporate action by one or more factions of shareholders or directors who disagree about a significant aspect of corporate policy." Id. Here, the dispute clearly involves a deadlock. Belk and Yarborough are unable to compromise and disagree about a significant aspect of the company's policy—its co-management.

There is ambiguity, however, in whether this is a *voting* deadlock because no formal voting on the co-manager issue has occurred. Belk claims that there has been "no vote," so there cannot be a voting deadlock. However, Yarbrough has emailed Belk several times demanding to be added as co-manager of QSL and asking for her vote on the matter. As a result, it is not entirely clear whether the parties' dispute falls within the scope of the QSL Agreement. But "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone, 460 U.S. at 24–25. In the light of this presumption, the Court is satisfied that the parties' dispute falls within the scope of Section 13's arbitration provision.

### 2. Interstate commerce

Before compelling arbitration, the Court must be satisfied that the underlying contract evidences a transaction affecting interstate commerce. Citizens Bank v. Alafabco, Inc., 539 U.S.

52, 56 (2003). "As the decisions of the United States Supreme Court have made clear, there are few, if any, economic or commercial transactions that are beyond the reach of Congress's commerce power." <u>Serv. Corp. Int'l v. Fulmer</u>, 883 So. 2d 621, 628 (Ala. 2003). Here, Plaintiffs argue that their complaint and the QSL Agreement "easily establish a substantial effect on interstate commerce." (Doc. 7 at 17). Defendants' response does not contest this issue.

Based on the evidence presented by Plaintiffs, the Court is satisfied that the QSL Agreement evidences a transaction affecting interstate commerce. Plaintiffs point to Section 1.7 of the QSL Agreement, which "confirms the business QSL was formed to transact is the purchase and development of real estate and erecting new or improving existing, buildings or structures 'wherever situate[d].'" (Doc. 7 at 18) (quoting Doc. 1-1 at 9). Plaintiffs also point to their complaint, which explains that "QSL's operations and the business transactions of its members have included numerous interstate transactions." (<u>Id.</u>). Thus, Plaintiffs have shown that a valid arbitration agreement exists, the dispute falls within the scope of the agreement, and the agreement involves interstate commerce. The next issue concerns the request for specific performance.

**B. Whether the requirements for specific performance are necessary.**

"Specific performance is an equitable remedy . . . in the nature of a mandatory injunction, which requires a party to an agreement to perform its obligations under the agreement." 5 Dennis H. Tracey, II, <u>Bus. & Com. Litig. Fed. Cts.</u> § 57:3 (5th ed. 2024). An order compelling arbitration is very similar because it requires a party to an agreement to arbitrate. As such, "[a]n action for specific performance of a contract is closely analogous to an action to compel arbitration." <u>United Paperworks Int'l, Loc. No. 395 v. ITT Rayonier, Inc.</u>, 931 F.2d 832, 835 (11th Cir. 1991). "[T]he Supreme Court has characterized a suit to compel arbitration as a suit for specific performance of a contract to arbitrate grievance disputes." <u>Id.</u> So too has the Eleventh Circuit. <u>Id.</u>

Plaintiffs argue that "the only difference in Plaintiffs' Motion and the typical motion to compel arbitration is that Plaintiffs, unfortunately, had to initiate litigation to enforce the arbitration provision (as opposed to raising it as a defense to litigation), and Plaintiffs seek urgent and immediate relief." (Doc. 7 at 18). Plaintiffs explain that "courts routinely enter specific performance in the arbitration context by compelling arbitration—and, without any showing that legal remedies are inadequate or other requirements for equitable relief." (Id.). In support, Plaintiffs cite United Paperworks Int'l, Loc. No. 395 v. ITT Rayonier, Inc., 931 F.2d 832, 835 (11th Cir. 1991) and McDonald v. Grimsley, 772 F. Supp. 3d 1306, 1316 (S.D. Ala. 2025).

Effectively, Plaintiffs argue that they should not have a heightened standard for compelling arbitration simply because they initiated the action. The Court agrees. Nothing in the FAA requires a heightened standard for granting a motion to compel arbitration when the motion is filed by the plaintiff. Defendants do not dispute this contention, and Defendants offer no caselaw suggesting a plaintiff must meet the requirements for specific performance before a court may compel arbitration. In fact, courts have regularly granted a plaintiff's motion to compel arbitration without analyzing whether the requirements for specific performance are met. See, e.g., Schklar v. Evans, No. 1:15-CV-2265-AT, 2015 WL 9913859 (N.D. Ga. Dec. 29, 2015). Monsanto Co. v. Georgia Farm Servs., LLC, No. 1:09-CV-46 (WLS), 2012 WL 13070392 (M.D. Ga. June 7, 2012).

At bottom, Plaintiffs' decision to frame the motion to compel arbitration as a motion for specific performance does not change the Court's analysis under the FAA. Section 4 provides that "[t]he court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. Having been satisfied that the making of the QSL Agreement and the failure to comply with it is

not in issue, the Court must make an order compelling arbitration under the QSL Agreement. Thus, Plaintiffs' motion must be granted to the extent Plaintiffs seek an order compelling arbitration.

### C. Mandatory stay of the action.

The FAA provides that courts "shall stay the trial" of an action if the court is "satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement." 9 U.S.C. § 3. However, the FAA is clear that the stay shall be granted "on application of one of the parties." Id. Here, Plaintiffs' motion does not ask for a stay in the action pending arbitration under the QSL Agreement. Until "one of the parties" moves for a stay of the action pending arbitration under the QSL Agreement, this action remains pending.

### V.     CONCLUSION

The Court is not satisfied that the parties agreed to arbitrate arbitrability under the QSL II Agreement. Thus, Defendants' motion to compel arbitration under the QSL II Agreement, (Doc. 4), is **DENIED.** The Court is satisfied that the requirements for compelling arbitration under the QSL Agreement are met. Therefore, Plaintiffs' motion for specific performance, (Doc. 7), is **GRANTED in part**, to the extent that Plaintiffs seek an order compelling arbitration under the QSL Agreement.

**DONE** and **ORDERED** this **28th** day of **October 2025**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**